## TRUST CO. OF AMERICA v. CHICAGO, P. & ST. L. RY. CO. OF ILLINOIS.

### RAMSEY et al. v. STEAD, Atty. Gen., et al.

(District Court, S. D. Illinois, S. D.    September 27, 1912.)

1. COURTS (§ 264*)—JURISDICTION OF FEDERAL COURTS—ANCILLARY PROCEEDINGS.

A petition, by railroad receivers appointed by a federal court in a foreclosure suit, for an injunction to restrain the enforcement of a state statute fixing fares or rates which affect the earnings of the road, on the ground that it is confiscatory and unconstitutional, is ancillary to the main suit and within the jurisdiction of the court.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 801; Dec. Dig. § 264.*]

2. CARRIERS (§ 12*)—STATE REGULATION OF RATES—APPORTIONMENT OF EXPENSES.

The revenue train mileage basis, used by railroads in apportioning common operating expenses between their freight and passenger business, while concededly only an approximation, held, on the evidence, the most satisfactory for making such apportionment, for the purpose of determining the reasonableness of a state statute fixing passenger fares, and the revenue or gross earnings basis the most equitable for apportioning the expense of a road's interstate and intrastate passenger service, making a proper allowance for the greater cost of the intrastate business.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 11, 12; Dec. Dig. § 12.*]

3. CARRIERS (§ 12*)—STATE REGULATION OF RATES—REASONABLENESS.

The Illinois passenger rate act of May 27, 1907 (Laws Ill. 1907, p. 746), fixing maximum fares of two cents per mile, held confiscatory and unconstitutional as applied to the Chicago, Peoria & St. Louis Railway Company of Illinois, on evidence that during its enforcement of such rates its net earnings on its intrastate passenger business were only about 1 per cent. on the value of the property employed therein, whereas it was entitled to earn 6 per cent.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 11, 12; Dec. Dig. § 12.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by the Trust Company of America against the Chicago, Peoria & St. Louis Railway Company of Illinois. On intervening petition of John P. Ramsey and H M. Merriam, receivers of defendant, against W. H. Stead, Attorney General of Illinois, and others. On final hearing on exceptions to master's report. Exceptions overruled, and decree for petitioners.

Prior to the 1st of July, 1909, the Trust Company of America filed a bill against the Chicago, Peoria & St. Louis Railway Company of Illinois, to foreclose a mortgage upon a railroad. John P. Ramsey and H. M. Merriam were appointed receivers of the railway by order of July 1, 1909. They operated the road until October 13, 1909, when they filed their intervening petition against W. H. Stead, Attorney General of Illinois, and the various state's attorneys for the counties through which the road runs, for the purpose of testing the validity of the maximum railway rate act approved May 27, 1907, fixing the maximum passenger rate at two cents per mile. On January 3, 1910, the Attorney General and the other respondents demurred to the intervening petition of the receivers upon several grounds, among others, that it appeared by the petition and the bill that the subject-matter of the petition was wholly unrelated to the bill, and that an answer to the intervening petition would raise a new and independent issue in the foreclosure suit, wholly foreign to the purpose and subject-matter of the bill, and wholly unrelated to the issue raised by the bill and answer. The court overruled the demurrer.

On October 13, 1909, the receivers moved for a preliminary injunction according to the prayer of the intervening petition, and on the same day the court issued a preliminary injunction, restraining the respondents from enforcing or attempting to enforce the rates provided for in the Illinois maximum rate act referred to, and from enforcing or attempting to enforce, through any agency provided in the statutes of Illinois, or otherwise, any of the penalties prescribed by the statutes of the state for failure on the part of the petitioners to observe any of the provisions of the maximum rate act, and from commencing or prosecuting any suit or action for the failure of the petitioners to observe the rates provided for in said act. It was further provided in the order that the receivers, at the time of the sale of each passenger ticket, should deliver to each passenger a coupon, stating upon its face the amount of the fare received from the passenger in excess of two cents per mile, and that the holders of coupons have a first lien upon all the property of the railway company to secure the payment of all costs and damages sustained by them by the reason of the issuing of the preliminary injunction, if it should be finally adjudged that the injunction was wrongfully issued.

On January 25, 1910, the Attorney General and his co-respondents answered the intervening petition, again raising the question of jurisdiction and putting the merits of the petition in issue. Issue was joined March 9, 1910, by the filing of the general replication by the receivers. Thereupon the case was referred to Walter McClelland Allen, as master in chancery, to hear the testimony produced by the parties and report his conclusions of fact and law thereon. The evidence was taken before the master, who filed his report July 19, 1911, as follows:

"Pursuant to an order of reference heretofore entered in the above-entitled cause, whereby said intervening petition was referred to me, as one of the masters in chancery of this court, to hear the testimony produced by the parties thereto, and report conclusions of fact and law thereon, I respectfully submit the following report, and herewith return a typewritten transcript of the testimony as a part thereof.

#### "The Issues.

"The petitioners, who were appointed receivers on the 1st day of July, 1909, of the property of the Chicago, Peoria & St. Louis Railway Company of Illinois, an Illinois corporation, in this cause, on a bill to foreclose a mort-

gage upon the railway property, attack the validity of the act of the General Assembly of the state of Illinois passed in the year 1907 (Laws 1907, p. 476), commonly known as the 'Two Cent Rate Act,' as a deprivation of due process of law, contrary to the provisions of section 1 of the fourteenth amendment to the Constitution of the United States, as impairing the obligation of the contract implied in the charter of the company granted it by the state, in violation of section 10 of article 1 of the Constitution of the United States, and aver that the rate of charges prescribed by said act is unreasonable, unjust. oppressive, discriminative, confiscatory, and void.

"Petitioners claim that from the 1st day of July, 1907, until the 1st day of July, 1909, the railway was operated in compliance with the provisions of said act and with as great economy as was compatible with efficient service to the public and proper maintenance and preservation of its property, and that such operation resulted for the first year in an actual deficit of $8,032.41 in the earnings derived from the intrastate passenger business within the state of Illinois, and for the second year in a surplus of only $794.80; the total intrastate passenger earnings for said period amounting to $510,230.27, while the operating expenses solely incident to said business, including no fixed charges, except taxes, amounted to $517,467.88.

"Upon the presentation of their petition an order for a preliminary injunction was granted, restraining the respondents, the Attorney General and the state's attorneys of the various counties through which the railroad's right of way extends, from enforcing the rates prescribed by said act and penalties provided for violation thereof, and directing the petitioners, upon the sale of passenger tickets, to issue to each purchaser a coupon, secured by first lien upon the railway property, for the amount paid in excess of two cents a mile, the coupons to be payable in the event that the injunction was wrongfully issued.

"Demurrer to the petition was overruled, and on March 9, 1910, answer was filed, in substance denying the allegations of the bill and challenging the methods used in the division of common expenses between the freight and passenger business and of the earnings and expenses between interstate and intrastate passenger traffic.

### "Controverted Questions of Fact.

"The ultimate questions of fact in controversy, upon which the right of petitioners to a permanent injunction depends, are:

"(1) The proper and equitable division of expenses common to both freight and passenger traffic, which cannot be directly allocated to either, so that each branch of the service shall bear its just share of the common expenses.

"(2) A proper and equitable division of earnings and expenses between intrastate and interstate passenger business necessary to the ascertainment of earnings and expenses of the intrastate business.

"(3) Proper apportionment of the value of the property as a whole to each branch of the service, in order to ascertain the value of the investment in the intrastate passenger service upon which a fair return should be computed.

"(4) The value of the use to the public of the intrastate passenger service rendered by petitioners.

### "Division of Common Expenses.

"The basis of division of most of the common operating expenses adopted by petitioners in order to arrive at a just apportionment between the freight and passenger service is that known as 'revenue train mileage.' It is not contended that this basis is mathematically accurate, but that it more nearly approximates a division of expenses just to both branches of the service than any other basis yet devised, that the existence of so many indeterminate factors renders such accuracy impossible, and that in the present state of the development of railroad accounting this basis represents the substantially unanimous judgment of the railroad world. It is a rule, also, which was prescribed by the Interstate Commerce Commission at a time when it

required a division of these expenses, and as promulgated in its form of report for the year 1893 is thus stated: 'Expenses which are not naturally chargeable to either traffic should be apportioned on a mileage basis, making the division between the passenger and freight traffic in the proportion which the passenger and freight train mileage bears to the total mileage of trains earning revenue.'

"Mr. Robert I. Farrington, vice president of the Great Northern Railroad, who has spent 27 years in railroad service, and was a member of the committee appointed by the Association of American Railway Accounting Officers to confer with the Interstate Commerce Commission with reference to a uniform system of railway accounting, which the Commission was authorized by the Hepburn bill, passed in 1906 (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1911, p. 1288]), to make, in explanation of the train mileage basis, likens the railroad business to that of a manufacturing institution, whose product is trains and train miles. Its entire business is devoted to running trains, getting the business to handle in trains, and taking care of it after it has been handled in trains. The train, he says, is the only unit that applies equally to the expense and the revenue. Other witnesses of large railroad experience, who have given much thought to the question, support this basis of division. These witnesses include W. D. Taylor, chief engineer of four railroads, who has also occupied the chair of Civil Engineering in the University of Louisiana for seven years, of Railroad Engineering in the University of Wisconsin for four years, and has devoted half his life since maturity to practical work; Chester J. McPherson, assistant to the general manager of the Missouri Pacific Railroad; W. B. Storey, vice president of the Santa Fé Railroad; W. B. Doddridge, who has been general superintendent of the Union Pacific Railroad; John Hurst, general accountant of the Pennsylvania Line; F. P. Johnson, statistician of the Missouri Pacific; R. M. Huddleston, chief auditor of the New York Central; John P. Ramsey, one of the petitioners; H. W. Berger, auditor of the Chicago, Peoria & St. Louis Railway; and M. P. Blauvelt, controller of the Illinois Central Railway.

"On behalf of the respondents, Conway W. Hillman has testified against this basis of division of common expenses. Mr. Hillman entered railroad service in 1876 as a telegraph operator for the Cumberland Valley Railroad, and served that road in the capacities of agent, operator, scales clerk, yard clerk, assistant dispatcher, and finally as dispatcher, until 1881, when he took a position with the Northern Pacific Railroad in the treasurer's office, and became assistant treasurer in the year 1888. In 1896 he organized the accounting department of the Metropolitan West Side Elevated Railway Company of Chicago. In 1903 he left the service of the company and took employment with the Chicago, Rock Island & Pacific Railroad in the controller's office for a short time, and afterwards as chief clerk in its insurance department. This is the extent of his experience in practical railroad operation. He has since followed the business of a public accountant. For the past three years or more he has devoted almost his entire time to railroad rate cases, and has been employed as an expert on behalf of various states and their Railroad Commissions, where such litigation has been pending. The division of common expenses did not become a practical question with him until after he was employed as an expert in rate litigation. In all, he has been employed in 10 or 12 of such cases. In the present case he has had access to the railway company's books and records, and his assistants were engaged for three months or thereabouts in the work of compiling from these records the data from which he testifies. While petitioners have presented the results of operations for two years, respondents have taken only the year ending June 30, 1909, in which the earnings were considerably larger than in previous years. Mr. Hillman regards revenue train mileage as only an indicative factor, and presents his own formulæ in Respondents' Exhibit 7 as a more accurate method of division. By the application of these formulæ, he arrives at the figures shown in Respondents' Corrected Exhibit 2, which shows a total of operating expenses incurred for the year ending June 30, 1909, of $205,476.29 in the intrastate passenger

business, while the application of the formulæ used by petitioners, introduced in evidence as Exhibit 2, results in a total of operating expenses chargeable to intrastate passenger business amounting to $233,943.65, exclusive of taxes, rental, and hire of equipment—a difference in results of over $28,000, arising from the difference in method of apportioning common expenses.

"The Hillman method is set forth and explained in detail in his testimony, and lengthy cross-examination was had. The subject-matter is one of expert railroad accounting, upon which the master must form his conclusions according to the weight of evidence drawn from expert sources. The petitioners have produced the testimony of men of high standing and large experience in railroad operation and accounting in support of their basis of division. Mr. Hillman stands alone in opposition to their views. The revenue train mile basis was adopted and came into general use by railroads without reference to rate litigation, but for the purpose of determining the cost and profit of operation for the railroads' own corporate purposes, and the testimony of the witnesses for petitioners is free from the common criticism applied to expert testimony. Railroads have both the freight and passenger rate questions to meet. Unless, therefore, the Hillman method, as explained by its author, is of itself so persuasive of its merits as to overcome this general judgment of men specially equipped in this particular field, there can be no doubt that the weight of the testimony is on the side of the petitioners.

"The Interstate Commerce Classification of accounts has been followed in this case, and is set forth in the exhibits. There are in all five blocks in these Accounts; (1) Maintenance of Way and Structure; (2) Maintenance of Equipment; (3) Traffic Expenses; (4) Transportation Expenses; (5) General Expenses—and a total of 108 different accounts.

"The criticism made of the revenue train mileage basis is that it is arbitrary, involves many assumptions, does not reflect the use of the facilities, the upkeep of which causes the expense, and is at best a rough approximation. This criticism involves the claim, for the Hillman method, of elimination of these objections, or at least of such a substantial reduction of them as to entitle it to be substituted as producing a more reliable result. Mr. Hillman himself claims for his methods of division practical accuracy.

"Reference to some only of the items of common expense will be sufficient for the purposes of this report.

"Account No. 2 in the first block of accounts (Maintenance of Way and Structure—Ballast):

"Petitioners for the year ending June 30, 1909. charge to passenger expense $852.09 (Exhibit 8) upon the revenue train mileage basis. Mr. Hillman charges only $424.68 out of a total freight and passenger expense of $1.860.76. He first divides the expense into two parts—that caused by wear, which he estimates at 10 per cent., following a holding of the Wisconsin Railroad Commission in Buell v. Chicago, Milwaukee & St. Paul Railway Company; and that caused by weather, which he estimates at 90 per cent. He then divides the 10 per cent. assumed to be due to wear between freight and passenger upon the basis of train weights passing over the track, and the remaining 90 per cent. upon the basis and in the proportions of earnings freight and passenger. In arriving at this result he assumes:

"(1) That the percentage attributed to wear and weather are correct, or substantially so; there being no available statistics upon the question.

"(2) That the extra speed of a passenger train equalizes the lower adjustment of the freight train in destructive effect upon the ballast.

"(3) That the kind of ballast used makes no difference in the percentage.

"(4) That the freight train weights upon the Chicago, Peoria & St. Louis Railroad are obtained with substantial correctness by multiplying the number of freight car miles by the average weight of a freight car in use generally on railroads, to this adding the ton miles of the live freight, and to this the weight of the engine and tender, multiplied by the engine miles, the weight of the engine being figured upon a general average basis; that the passenger train weights are obtained with substantial accuracy in a similar

manner, allowing 150 pounds per passenger and the same weight of express, mail, and baggage, making a total of 300 pounds as the weight of a passenger, express, mail, and baggage.

"All these assumptions are controverted, and, obviously, in the absence of statistics upon the general questions and data relating to the particular railway, the conclusion drawn and computations made based upon them are unreliable, and represent merely an individual opinion.

"The only reason assigned for dividing 90 per cent. of this expense in proportion to freight and passenger earnings is that it is an expense the unit of which does not exist in the operation of the road, and that the earnings are the source from which the expense must be paid.

"There has been much discussion in the briefs of counsel as to the proper factor to be used in dividing the common expense due to wear of ballast, ties, rails, roadway, and tracks, and some other accounts. It is conceded, as it obviously must be, that the weight of trains has an effect, and that this effect cannot be ignored. Respondents say that the train mileage basis ignores train weights entirely, while petitioners deny that this is so. The true situation is that while no particular percentage of the expense is assigned to weight, nor is it used as a component factor of any formula, yet its consideration is involved as one of the elements entering into the train mileage basis. Mr. Taylor's opinion is that weight alone is not a fair factor, because a minor one. Mr. Blauvelt says, in testifying in support of the train mile basis, that it takes into consideration all the factors.

"Mr. Storey did say that the train mile basis, without an assumption that every train was of a certain weight, would be 'a poor measure of relative deterioration'; but it is clear, from his testimony as a whole, that what he meant was that it was fair to assume that each train had the same destructive influence upon the track—weight, speed, and other elements considered. 'You have got,' he says, 'to take all kinds of elements, and then in the end form a judgment alone. There is no absolute measure.'

"The train weight basis, as applied by Hillman, ignores some important factors. One of these is the number of points of contact where the weight rests; another, the fact that the locomotive does as much or more damage to the track than the following train; another, that it is necessary to keep the track in a much better condition, because of the higher speed of passenger trains, than would be necessary if the track were used for freight trains only, a fact which is illustrated, in actual operation, where two tracks are maintained, one for passenger and the other for freight service.

"Account No. 6, Roadway and Track, for the year ending June 30, 1909, amounts as computed on the train mileage basis used by petitioners to $30,363.86 (Exhibit 8), while the Hillman method produces only $15,494.75 (Respondents' Corrected Exhibit 2).

"In the division of this account between wear and weather, Hillman takes the various wear percentages he has already used for the prior accounts: Nos. (2) Ballast, 10 per cent. wear, 90 per cent. weather; (3) Ties, 17.5 per cent. wear, 82.5 per cent. weather; (4) Rails, 90 per cent. wear, 10 per cent. weather; (5) Other Track Material, 90 per cent. wear, 10 per cent. weather—together those afterwards used for the following accounts: Nos. (8) Bridges, Trestles, and Culverts, 15 per cent. wear, 85 per cent. weather; (10) Grade Crossings, Fences, Cattle Guards, and Signs, 25 per cent. wear, 75 per cent. weather—and applies each of these percentages, respectively, to the amount in dollars and cents of the particular account, adds together into one total sum the various sums thus obtained, representing wear, and then applies the percentage which the amount produced is, of the total amount representing both wear and weather, to the sum total of common expenses in this account. Having thus obtained his percentages for division between wear and weather, he then divides the weather proportion on the basis of earnings and the wear proportion on the basis of train weights.

"All of the assumptions involved in the accounts 2, 3, 4, 5, 8, and 10 are necessarily involved in this division, and in addition the process is by the use of averages. This division further illustrates the constantly recurring

effect of assumptions indulged with respect to one account entering into the others and the intermingling in the result produced of unrelated items of expense.

"Account No. 13, Telegraph and Telephone Lines:

"Hillman's division of this account is one half on the revenue train mile basis and the other half upon the car mile basis. This division is admitted to be without data to support it, and is purely arbitrary.

"Account No. 22 on Petitioners' Exhibit 8 (No. 18 on Respondents' Corrected Exhibit 2)—Maintaining Joint Track Yards and Other Facilities:

"Petitioners' computation for the year ending June 30, 1909, shows total expense chargeable to passenger traffic $12,731.35, while Hillman shows only $8,335.17, which according to the formulæ shown in Respondents' Corrected Exhibit 7 he professes to have allocated. Of course, it is manifest and agreed by the parties that allocation—meaning thereby the direct charging of an expense caused by one branch of the service to that branch—should always, where possible, be adopted, and, if Mr. Hillman had done this, there could be no question of the propriety of his treatment of this account. He says that he gave particular attention to this account, that his analysis is especially his own work, and that he personally examined all the vouchers. The terminals are at six places: (1) Springfield; (2) between Peoria and Pekin, including the terminals at both cities; (3) St. Louis; (4) Ridgely and the tower at Alton; (5) Jacksonville; (6) Madison. Common expenses at Springfield he professes to divide partly upon the basis of other maintenance accounts and partly upon the basis of train miles including switching. Peoria and Pekin common terminal expenses he professes to divide upon a wheelage basis. St. Louis and Madison expenses are allocated to each branch. Ridgely and Jacksonville common expenses he divides upon the revenue train mile basis.

"Cross-examination developed many errors in the analysis of the various amounts used by Hillman, and it is conceded by respondents' counsel that he was in error in basing his division of Peoria and Pekin Union bills on the switching bills, instead of the joint mileage statement of engines and cars of the Chicago, Peoria & St. Louis Railway passing over the Peoria & Pekin Union tracks from Pekin to Peoria. It is said, however, that this error only makes a difference of $894.61. He divided $3,295.31, part of this account accruing at Springfield, on the train mile basis, upon the assumption that the expense was mainly for the upkeep of crossings and crossing towers. when in fact it included $1,399.45 paid for the maintenance of the Madison street track and $598.63 paid for the upkeep of the passenger station. It is clear that the results arrived at are unreliable, and that neither in process nor results does the division made represent an 'allocation,' in the sense in which that term has been used in this proceeding.

"Passing for further illustration to the second block of accounts—Maintenance of Equipment:

"Account 24, Superintendence, is divided by Hillman, as is the same account under Maintenance of Way and Structures, No. 1, and under Transportation Expenses, No. 61, upon the basis of all other accounts in the block, and therefore is affected by every valid criticism of these other accounts. This is true of a number of accounts, and of the entire fifth block of Accounts, General Expenses, 106 to 116, which are divided upon the basis of all the preceding division of accounts. The process of separate analysis of each item of common expense, instead of using one basis for many, appears upon the surface to have merit; but when the process is set forth in detail, and applied to the various items, the claim of superiority turns out to be more specious than real. Arbitraries, presumptions, opinions, averages, and approximations have not been eliminated, and certainty substituted in their place; but, instead of one yardstick, admittedly inaccurate, but in general use as practically satisfactory, there are many yardsticks, also inaccurate, and without other sanction than an individual opinion.

"Sufficient reference has been made to particular items for the purpose of showing the general effect of the application of the Hillman methods to the entire list of common expenses, and the final question is whether his un-

supported individual opinion is to be accepted, or the judgment of many men of larger experience.

"The same sort of testimony was given in the Minnesota case (Shepard v. Northern Pacific Railway [C. C.] 184 Fed. 765), where the master, and later, upon exceptions, the court, rejected the methods advocated by Hillman, and adopted the train mileage basis, which was also the basis used in the Missouri and Oklahoma rate cases. The weight of the testimony upon this question I find to be with the petitioners.

"Division of Cost Between State and Interstate Passenger Traffic.

"Petitioners' division of cost between state and interstate passenger traffic is upon the revenue basis, and is set forth for the years ending June 30, 1908, and June 30, 1909, in Exhibits 11 and 12. The computation includes also an extra cost of 15 per cent. applied to operating expenses, only, of state traffic over interstate.

"Respondents' method of division is set forth in Exhibit 7, and is not expressed in a single formula, but proceeds according to Mr. Hillman's individual view throughout the list of accounts.

"As in the case of the division of common expenses between freight and passenger traffic, many witnesses of experience have testified in support of the method applied by petitioners. That there is an excess cost of carrying state passengers over interstate is clear. The evidence would justify a larger percentage than that used by petitioners to represent it. The cause of this excess cost arises from the shorter haul of state passenger, the more frequent starting and stopping of trains, and consequent wear upon track, roadway, and equipment, greater consumption of fuel, greater use of terminal facilities, more frequent exposure of person and baggage to injury, the sale of more tickets, and the checking of baggage, the printing of more tickets, and greater accounting expense.

"The Chicago, Peoria & St. Louis has 244 miles of track, and the average length of haul of a state passenger for the year ending June 30, 1909, was 18.72 miles; of an interstate passenger, 50.26 miles.

"Because the apportionment of expense contended for by respondents is supported only by the individual judgment of Mr. Hillman, while the apportionment made by petitioners is supported by the judgment of many witnesses, who have had large experience in practical railroad operation, and because, further, the Hillman method is not of itself, to the mind of the master, persuasive of its superiority, and because cases thus far adjudicated have sanctioned the method used by petitioners, it is adopted, for the purposes of this report, as being supported by the weight of the evidence—not as being mathematically accurate, but as producing a more equitable result than the more detailed and complicated method employed by Hillman.

"Division of Property Valuation Between Freight and Passenger Business.

"After considerable testimony had been taken on behalf of petitioners as to the value of the railway property, it was stipulated that for the purposes of this case the value of the property used by it during the two years ending July 1, 1909, and thereafter by the receivers, for the conduct of its business as a common carrier of freight and passengers within the state of Illinois, was and still is $5,500,000. Petitioners divide this valuation upon the basis of gross revenue, using the operations for the two years ending June 30, 1909. This results in a valuation of $927,994.98 for the property used in state passenger business. For respondents, Mr. Hillman professes to divide the total property upon the expense basis, whereby he arrives at a valuation of $814,011.71 for the same property, assigning as his reason for using this basis that, in computing the expenses between freight and passenger, he had employed the factors which show the use of the property. The evidence does not warrant the statement that the factor which expresses the use has been applied in all cases. None of the expenses caused by weather have been so computed. In the division of Maintenance and Way and Structures Account much more of the expenses is assigned to weather than to wear, and such expense is extraneous to use. Nor does the expense basis appear, even though based on use, to be a more equitable one than the gross earnings basis. There

is, of course, no accurate basis for making this division, and the earnings basis is open to objection. Nevertheless, for the reasons given in the Minnesota case, where the court says: 'Because these bases (referring to the ton mile, passenger mile, car mile, engine mile, passenger car mile, and passenger engine mile) ignore the difference in the classes of freight carried and in the distances they are hauled, because the apportionment of the value of railroad property on the basis of the gross earnings of the classes of business which disclose approximately the values of their uses of it gives effect to these material differences, appeals more persuasively to the reason and produces results more equitable than any other basis suggested, and because this basis has commended itself to the judgment of and has been adopted by the courts in like cases, the master was justified in following their decisions'—the earnings basis and valuation made thereon are adopted.

### "Value of Use to Public.

"Counsel for respondents contend that there is no proof that a higher rate than two cents a mile will be fair to the public. The rule is as stated in Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, and quoted in the brief of counsel: 'What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth.'

"Ordinarily cost of production with a reasonable profit added determines the value of the product to the purchaser. This test of value assumes normal conditions attending the production. In the absence of proof of special circumstances, such as those suggested in Reagan v. Trust Co., 154 U. S. 413, 14 Sup. Ct. 1060, 38 L. Ed. 1028, waste in the management of the road, enormous salaries, unjust discrimination as between individual shippers, construction at a time when material and labor were at the highest price, or in localities where there is not sufficient business to sustain a road, proof of the cost of production makes at least a prima facie case.

"Counsel for respondents upon this branch of the case argue that the Chicago, Peoria & St. Louis Railway was unwisely built, and invoke, further, the doctrine laid down in Covington v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560: 'If the establishment of new lines of transportation would cause a diminution of the number of those who need to use the road, * * * that is not in itself a sufficient reason why the corporation operating the road should be allowed to maintain rates that would be unjust to those who must and do use the property.'

"The argument of counsel is based upon the present existence of the competitive lines of the Chicago & Alton and Illinois Traction systems, the latter an electric interurban of recent construction. Counsel use five important terminal stations for comparison with the Chicago & Alton Railroad, showing a considerably shorter mileage than by the Chicago, Peoria & St. Louis Railway. On the other hand, counsel for petitioners point to other important stations, where the comparison is inapplicable, and where their road is the direct line; and, besides, counsel say that there is no evidence in this case that two cents a mile is compensatory to the Chicago & Alton Railroad. A finding, upon evidence of this character, that a rate in excess of two cents a mile is unjust to the public would lack substantial support and would be merely speculative. Density of population is one of the greatest factors in determining the reasonableness of a rate. Comparisons between rates are of little value, unless all the elements that enter into the problem are presented. Smyth v. Ames, supra. For a like reason, the comparative table presented in Respondents' Exhibit 6 is not regarded as of value.

"From the evidence in this case it appears that, to be compensatory, a maximum rate of three cents a mile is necessary. It seems to the master that the rights of the public at noncompetitive points upon this railroad would be adequately protected by conditioning the grant of relief, so that a rate of three cents should be the maximum chargeable between any stations on its line within the state.

"Revenues.

"The amount of intrastate passenger revenue, as computed by the accountant for the petitioners for the year ending June 30, 1909, is $261,339.36, while the computation made by the accountant for respondents is $261,145.62. The difference is trifling, and does not affect the final result sufficiently to merit discussion.

"Findings.

"From the evidence, therefore, and in accordance with the views herein expressed, I find:

"(I) That the total value of the Chicago, Peoria & St. Louis Railway property used during the two years ending July 1, 1909, and thereafter by the receivers, for the conduct of its business as a common carrier of freight and passengers within the state of Illinois, is the sum of $5,500,000.

"(II) That the most equitable basis of division of this total valuation between the freight and passenger traffic is that of gross earnings, and that upon this basis the value of said property used during the same period for the transportation of passengers within the state of Illinois is the sum of $927,994.98.

"(III) That the most equitable bases of division of expenses common to the freight and passenger traffic which cannot be allocated directly to either are those set forth in Exhibit 2, whereby most of these expenses (reference being had to the exhibit) are divided upon the basis of revenue train mileage.

"(IV) That 6 per cent. per annum is a reasonable net return upon the value of the railway property used in the transportation of passengers within the state of Illinois. The net annual income upon this basis would be the sum of $55,679.69.

"(V) That the expenses of the intrastate passenger business for the year ending June 30, 1908, amounted to $256,923.32, while revenue from the same source amounted to $248,890.91, leaving a deficit of $8,032.31 in the net earnings; that the expenses of the intrastate passenger business for the year ending June 30, 1909, amounted to the sum of $260,544.56, while the revenue from the same source amounted to $261,339.36, resulting in a surplus of net earnings amounting to $794.80. (Exhibits 3 and 4.)

"(VI) That the effect of the operation of the maximum rate law passed by the Legislature of the state of Illinois in the year 1907 is to deprive petitioners of a reasonable return upon the value of the Chicago, Peoria & St. Louis Railway property devoted to passenger traffic within the state of Illinois, and that a maximum rate of three cents a mile, chargeable to passengers using its line within the state, would not be unjust to the public.

"Conclusion.

"From the foregoing findings I conclude:

"That the act of the Legislature of the state of Illinois passed in the year 1907 entitled 'An act to establish and regulate the maximum rate of charges for the transportation of passengers by corporations or companies operating or controlling railroads in part or in whole in this state and to provide penalties for the violation of the provisions thereof and repealing all acts or parts of acts in conflict therewith' is confiscatory and operates to deprive petitioners of the power to earn reasonable compensation for the services rendered in the carriage of passengers, without due process of law and to deny them the equal protection of the laws, in violation of the Constitution of the United States, and that said act, so far as petitioners are concerned, is void and of no effect, and petitioners are entitled to a decree as prayed in their intervening petition.

"It is recommended, however, that such decree be so conditioned that a rate of three cents a mile shall be the maximum chargeable to intrastate passengers on the line of said railway.

"Respectfully submitted,              Walter McClellan Allen,
                                                        "Master in Chancery."

On August 17, 1911, the Attorney General and his co-respondents filed exceptions to the report and findings of the master, substantially covering the merits of the report. On November 27, 1911, the cause came on for final hearing.

Under section 17 of act of Congress of June 18, 1910, 36 Stat. 557, c. 309, Judicial Code, § 266 (U. S. Comp. St. Supp. 1911, p. 236) providing that an interlocutory injunction, suspending or restraining the enforcement, operation, or execution of any state statute, by restraining the acts of any state officers in the enforcement or execution of such statute, shall be granted only by three federal judges, the two additional judges were called in the final hearing; the preliminary injunction having been granted by a single judge prior to the passage of the act of 1910.

Wilson, Warren & Child, of Springfield, Ill., for receivers.

W. H. Stead, Atty. Gen., and Thomas E. Dempcy, Asst. Atty. Gen. (June C. Smith, of Centralia, Ill., of counsel), for defendants.

Before BAKER, Circuit Judge, and HUMPHREY and SANBORN, District Judges.

SANBORN, District Judge (after stating the facts as above). [1] A technical question of jurisdiction was raised in the former Circuit Court by demurrer, and later by answer to the effect that the receivers' injunction petition was not ancillary to the foreclosure suit, because the subject-matter of the petition is wholly unrelated to the subject-matter of the bill. The demurrer was overruled by the Circuit Court, upon the authority of Ex parte Young, 209 U. S. 123, 144, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764, holding that a federal question is raised in suits like this, and Compton v. Jessup, 68 Fed. 263, 15 C. C. A. 397, Blake v. Pine Mountain Coal Co., 76 Fed. 624, 22 C. C. A. 430, and like cases, holding that petitions similar to this are ancillary to the main suit, and hence within the jurisdiction. We are entirely satisfied that the jurisdiction was properly sustained.

The Chicago, Peoria & St. Louis Railroad was operated at a loss during the fiscal years of 1908 and 1909, and on June 30, 1909, the total deficit was $202,071.60. A foreclosure suit was at once begun, and this intervening petition was filed in that suit. Compliance with the two-cent maximum passenger rate act of Illinois by the road was in part responsible for the deficit. Receivers were appointed, who operated the road under the same conditions up to October 13, 1909, when they filed this petition, alleging that the maximum passenger rate act, as applied to this railroad, was confiscatory, and constituted a taking of its property without due process of law. A temporary injunction was issued, prohibiting the enforcement of the statute as to this road, and the receivers thereupon put in force a three-cent rate, with one-cent coupons, as provided in the injunctional order.

The question now before us is whether the evidence shows the Illinois rate to be confiscatory, as applied to this particular railroad, in respect to passenger returns.

[2] Earnings from the state passenger business, including mail, express, and similar returns from the running of passenger trains, are readily found. Expenses directly chargeable to such business may also be figured with reasonable certainty. But the "common expenses," so called, like maintenance of the line, the equipment,

traffic, and general expenses, and their proper distribution, between freight and passenger business, present much difficulty. The master, following the great weight of the expert testimony, as well as the decisions of the courts, has adopted and applied what is known as the "revenue train mile" basis in the distribution of these common expenses between the freight business, state and interstate, and the passenger. On such basis the road was not earning a fair return from its state passenger business up to the time of the receivership, and the master concludes that the injunction should be made permanent, and the receivers allowed to charge three cents a mile for passenger service.

The revenue train mile basis of apportionment, as between freight business and passenger business, is applied to expenses not directly apportionable (called "common expenses") by the following method: The ninth annual report of the company shows the train mileage for 1909 of passenger trains, 446,540; freight trains, 532,962; mixed trains, 790; and special trains, 338. All but the last were revenue producing trains. Excluding the special trains, whose character is not shown, the total train mileage was 980,292. Of the mixed trains, one-fourth of the mileage was allowed to passenger service; the balance, to freight. The total passenger miles would therefore be 446,-737.5; and the freight, 533,554.5—total, 980,292; and the passenger percentage 45.57. The year 1909 is taken, instead of the year 1908 (June 30 to June 30), because showing a nearer recovery from the panic of 1907, and thus being closer to normal conditions. Thus, taking the common expense of superintendence for the year, which was $7,891.59, the passenger proportion would be $3,596.19. The master's figures for this item are $3,610.50, a difference of $4.31. This method of apportionment was applied to all the common expenses, in order to ascertain what part were passenger expenses, with the modifications referred to in Exhibit 2, shown on another page.

Next it was necessary to find the proportion of state and interstate passenger expense. This was done by finding the state and interstate revenues. It was found that the state passenger returns for 1909 were $261,339.26; interstate, $48,217.58; mail, express, and miscellaneous income earned by passenger trains, undivided as between state and interstate, $54,974.46—being a total of $364,531.40. By applying the revenue train mile basis to all common expenses for 1909, and allocating all direct passenger expenses, it was found that both these kinds of expense, including the proper share of taxes and hire of equipment, amounted to $350,914.45, which was the expense of producing the $364,531.40; also that the state passenger expense was $326,326.75. It was then found that the state passenger revenue represented 71.69 per cent. of the total passenger revenue; the interstate, 13.23 per cent.; and express, mail, and miscellaneous, 15.08 per cent. It was also shown by testimony for the receivers that it costs about 15 per cent. more to handle the state passenger business than it does the interstate, because of the shorter haul of state passengers and other reasons. By applying the additional 15 per centum to the operating expense, it was found that 2.75 per cent. of such

expense, or $8,973.99, should be added to the state passenger expense; the final result being that the state passenger business for 1909 earned a net return of $794.80, or less than 1 per centum. This method is approved in Chicago, etc., Co. v. Tompkins, 176 U. S. 179, 20 Sup. Ct. 336, 44 L. Ed. 417, Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, and Louisville & N. R. Co. v. Railroad Commission (D C.) 196 Fed. 800, 824.

[3] In order to find what the road was fairly entitled to earn on its passenger business in 1909, the total value of the railroad in that year was found to be $5,510,961. These figures were agreed to by both sides, and are supported by the testimony. To obtain the proportion of the passenger value, state, interstate, and mail and express, the total revenue of $1,554,600.37 was taken, and the total passenger revenue found to be 23.45 per cent. of this, making the valuation of the passenger proportion $1,292,329.35. 71.69 per cent. of this, or $926,464.46, represents the state passenger valuation. This should fairly earn 6 per cent., or $55,587.87. On this basis, the earnings for 1909 were about $55,000 too small. That this is the proper rule, see Smyth v. Ames, supra, and Missouri, K. & T. R. Co. v. Love (C. C.) 177 Fed. 493 (the Oklahoma case).

The plan or formula of division or allocation of expense for each fiscal year adopted by the master, and recommended by the testimony of substantially all the witnesses except Mr. Hillman, is as follows:

A. To the revenue freight train mileage 75 per cent. of the mixed train mileage is added, and to the revenue passenger train mileage 25 per cent. of the mixed train mileage is added, and the common expenses are apportioned on the percentage thus obtained. The mixed train mileage is treated in this manner, wherever revenue train mileage is used in apportioning common expenses.

B. Expenses incurred solely in the passenger business were charged to passenger, and expenses which could not be separated between freight and passenger, but were common to both, were divided in the ratio which the passenger revenue train mileage bore to the total revenue train mileage.

C. When the expense was upon a locomotive engaged in straight passenger service, the expense was charged to passenger. When the expense was upon a locomotive which had made both freight and passenger miles during the month, there was charged for each passenger mile made by that locomotive the average cost per mile of like expense on locomotives in straight passenger service.

D. These are expenses which were incurred solely in the passenger service.

E. Expenses incurred solely in the passenger business were charged to passenger, and expenses which could not be separated between freight and passenger, but were common to both, were divided in the ratio which the total passenger revenues bore to the total freight and passenger revenues.

F. Expenses incurred for a particular yard were charged to passenger in the ratio which the number of passenger cars bore to the total freight and passenger cars there handled. Expenses of a gen-

eral character incurred in all yards were charged to passenger in the ratio which the total number of passenger cars bore to the total number of freight and passenger cars handled in all yards.

G. Where the information obtainable showed wrecks to be passenger, the expense was charged to passenger; in months in which passenger wrecks occurred, all expense which could not be located directly was charged to passenger in the ratio which the passenger revenue train mileage bore to the total revenue train mileage.

Applying this formula to the classification of expense accounts in use on most railroads, recommended by the Interstate Commerce Commission, we obtain the following for the fiscal year 1909 (whereever the passenger percentage is 45 and a fraction, the figures in the passenger column represent the revenue train mile basis; when less than 45, a direct allocation to the freight business is indicated, and when greater than 45, a like allocation to the passenger):

DIRECT AND COMMON EXPENSE TABLE.

*I. Maintenance of Way and Structures.*

| | Total Expense. | Freight. | Passenger. | Passenger Per Cent. |
|---|---|---|---|---|
| 1. Superintendence .........A | $ 7,891.59 | $ 7,891.59 | $ 3,610.50 | 45.76 |
| 2. Ballast .................A | 1,860.76 | 1,008.67 | 852.09 | 45.79 |
| 3. Ties ...................A | 37,242.08 | 21,582.61 | 15,659.47 | 42.05 |
| 4. Rails .................A | 2,843.83 | 1,952.03 | 891.80 | 31.36 |
| 5. Other track material.....A | 11,702.55 | 7,594.04 | 4,108.51 | 35.11 |
| 6. Roadway and track.......A. | 74,891.98 | 44,528.12 | 30,363.86 | 40.54 |
| 7. Removal of snow, sand, and ice ..................A| | 1,191.26 | 713.10 | 478.16 | 40.14 |
| 8. Tunnels. (None.) | | | | |
| 9. Bridges, trestles and culverts ................A | 23,714.98 | 12,801.68 | 10,913.30 | 46.02 |
| 10. Crossings (over and under) A | 24.97 | 11.88 | 13.09 | 52.42 |
| 11. Grade crossings, cattle guards, and signs.......A | 6,033.20 | 3,205.56 | 2,827.64 | 46.87 |
| 12. Snow and sand, fences and snow sheds. (None.) | | | | |
| 13. Signal and interlocking plants ................A | 586.39 | 320.71 | 265.68 | 45.32 |
| 14. Telegraph and telephone lines ................A | 5,106.25 | 2,805.76 | 2,300.49 | 45.85 |
| 15. Electric power transmission. (None.) | | | | |
| 16. Buildings, fixtures, and grounds ..............A | 8,465.75 | 4,596.50 | 3,869.25 | 45.71 |
| 17. Docks and wharves. (None.) | | | | |
| 18. Roadway, tools, and supplies. .................A | 2,521.26 | 1,394.55 | 1,126.71 | 44.69 |
| 19. Injuries to persons........A | 1,080.66 | 575.23 | 505.43 | 46.77 |
| 20. Stationery and printing...A | 100.67 | 54.91 | 45.76 | 45.46 |
| 21. Other expenses..........A | 1,011.90 | 541.72 | 470.18 | 46.77 |
| 22. Maintaining joint tracks and other facilities, Dr. .....B | 28,964.66 | 16,233.31 | 12,731.35 | 43.95 |
| 23.          Do. Cr. .............B | 9,392.17 | 7,553.35 | 1,838.82* | 19.58 |
| Totals ................. | $205,752.57 | $116,558.12 | $89,194.45 | 43.35 |

*This is a deduction, not an addition.

## II. Maintenance of Equipment.

| | Total Expense. | Freight. | Passenger. | Passenger Per Cent. |
|---|---|---|---|---|
| 24. Superintendence .........A | $ 15,990.90 | $  8,754.64 | $ 7,236.26 | 45.26 |
| 25. Steam locomotives, repairs C | 98,164.44 | 79,961.26 | 18,203.18 | 18.54 |
| 26. Steam locomotives, renewals. (None.) | | | | |
| 27. Steam locomotives, depreciation ..................C | 13,207.44 | 11,218.80 | 1,988.64 | 15.06 |
| **Electric Locomotives.** | | | | |
| 28. Repairs.  (None.) | | | | |
| 29. Renewals.  (None.) | | | | |
| 30. Depreciation.  (None.) | | | | |
| **Passenger Train Cars.** | | | | |
| 31. Repairs ..................B | 18,771.81 | 100.00 | 18,671.81 | 99.50 |
| 32. Renewals.  (None:) | | | | |
| 33. Depreciation ............B | 3,067.96 | | 3,067.96 | 100.00 |
| 34. Freight cars, repairs.....B | 179,254.68 | 179,254.68 | | |
| 35. Freight cars, renewals....B | 2,573.08 | 2,573.08 | | |
| 36. Freight cars, depreciation B | 31,081.03 | 31,081.03 | | |
| **Electric equipment of cars.** | | | | |
| 37. Repairs.  (None.) | | | | |
| 38. Renewals.  (None.) | | | | |
| 39. Depreciation.  (None.) | | | | |
| **Floating equipment.** | | | | |
| 40. Repairs.  (None.) | | | | |
| 41. Renewals.  (None.) | | | | |
| 42. Depreciation.  (None.) | | | | |
| **Work Equipment.  (43–45.)** | | | | |
| 43. Repairs .................A | 2,473.99 | 1,343.41 | 1,130.58 | 45.70 |
| 44. Renewals ................A | 130.11 | 70.71 | 59.90 | 46.04 |
| 45. Depreciation ............A | 1,602.42 | 870.91 | 731.51 | 45.65 |
| 46. Shop, machinery, and tools A | 6,097.37 | 3,271.15 | 2,826.22 | 46.35 |
| 47. Power plant equipment.  (None.) | | | | |
| 48. Injuries to persons.......A | 941.76 | 593.59 | 348.17 | 36.97 |
| 49. Stationery and printing...A | 327.63 | 183.00 | 144.63 | 44.15 |
| 50. Other expenses...........A | 1,016.04 | 555.82 | 460.22 | 45.30 |
| 51. Maintaining joint equipment at terminals, Dr. ......D | 231.54 | 210.54 | 21.00 | .09 |
| 52.        Do. Cr. ..............D | 17.91 | | | |
| Totals ................. | $374,914.28 | $316,039.19 | $54,875.09 | 14.63 |

## III. Traffic Expenses.

| | | | | |
|---|---|---|---|---|
| 53. Superintendence .........D | $ 27,184.78 | $ 20,637.03 | $ 6,547.75 | 24.09 |
| 54. Outside agencies .........D | 36,817.38 | 33,437.79 | 3,379.59 | 9.18 |
| 55. Advertising ..............D | 1,587.88 | | 1,587.88 | 100.00 |
| 56. Traffic associations .......D | 1,228.54 | 1,179.48 | 49.06 | 3.99 |
| 57. Fast freight lines ......... | 1,087.72 | 1,087.72 | | |
| 58. Industrial and immigration bureaus.  (None.) | | | | |
| 59. Stationery and printing...B | 5,802.07 | 5,078.14 | 723.93 | 12.48 |
| 60. Other expenses.  (None.) | | | | |
| Totals ................. | $ 73,699.37 | $ 61,411.16 | $12,288.21 | 16.67 |

## IV. Transportation Other Than Train Expenses.

| | Total Expense. | Freight. | Passenger. | Passenger Per Cent. |
|---|---|---|---|---|
| 61. Superintendence ........A | $ 13,851.07 | $ 7,573.83 | $ 6,277.24 | 45.32 |
| 62. Dispatching trains........A | 15,438.54 | 8,840.81 | 6,597.73 | 45.06 |
| 63. Station employés ........A | 81,444.29 | 72,703.22 | 8,741.07 | 10.73 |
| 64. Weighing and car service association ............... | 3,022.22 | 3,022.22 | | |
| 65. Coal and ore docks. (None.) | | | | |
| 66. Station supplies and expenses ...............A | 6,190.25 | 3,392.46 | 2,797.79 | 45.20 |
| 67. Yardmasters and clerks...F | 12,149.72 | 11,992.28 | 159.41 | 1.31 |
| 68. Yard conductors and brakemen ..................F | 27,036.86 | 26,397.21 | 639.65 | 2.37 |
| 69. Yard switch and signal tenders ..................F | 608.40 | 597.07 | 11.33 | 1.86 |
| 70. Yard supplies and expenses ...............F | 560.22 | 550.83 | 9.39 | 1.68 |
| 71–76. (See next head.) | | | | |
| 77. Operating joint yards and terminals, Dr...........B | 97,996.33 | 84,477.42 | 13,518.91 | 13.80 |
| 78. Do. Cr. ..................B | 1,786.82 | 1,735.16 | 51.66 | 2.89 |
| 79–89. (See next head.) | | | | |
| 90. Interlockers, block and other signals ...............B | 3,017.32 | 1,804.87 | 1,212.45 | 40.19 |
| 91. Crossing flagmen and gatemen ..................B | 3,980.62 | 2,293.38 | 1,687.24 | 42.39 |
| 92. Drawbridge operation. (None.) | | | | |
| 93. Clearing wrecks..........G | 3,154.43 | 2,169.30 | 985.13 | 31.22 |
| 94. Telegraph and telephone operation ...............B | 1,784.13 | 1,470.90 | 313.23 | 17.56 |
| 95. Operating floating equipment. (None.) | | | | |
| 96. Express service. (None.) | | | | |
| 97. Stationery and printing...B | 7,360.76 | 4,476.91 | 2,883.85 | 39.18 |
| 98. Other expenses .........B | 1,515.94 | 1,164.42 | 351.52 | 23.19 |
| 99. Loss and damage, freight... | 16,789.59 | 16,789.59 | | |
| 100. Loss and damage, baggage D | 1.24 | | 1.24 | 100.00 |
| 101. Damage to property......B | 5,522.39 | 2,400.31 | 3,122.08 | 56.54 |
| 102. Damage to stock on right of way ...............B | 2,159.84 | 1,426.36 | 733.48 | 33.96 |
| 103. Injuries to persons.......B | 32,541.63 | 26,728.94 | 5,812.69 | 17.86 |
| 104. Operating joint tracks and other facilities, Dr. ....B | 11,527.19 | 6,611.17 | 4,916.02 | 42.65 |
| 105. Do. Cr. .............B | 3,003.92 | 1,997.43 | 1,006.49 | 33.50 |
| Totals ................. | $342,862.64 | $282,789.31 | $60,073.33 | 17.52 |

### V. *Train Transportation.*

| | Total Expense. | Freight. | Passenger. | Passen- ger Per Cent. |
|---|---|---|---|---|
| 71. Yard enginemen .........F | $ 15,836.12 | $ 15,472.65 | $ 363.47 | 2.29 |
| 72. Engine house expenses, yard engines ...............F | 4,652.47 | 4,564.80 | 87.67 | 1.88 |
| 73. Fuel, yard engines........F | 12,523.97 | 12,230.21 | 293.66 | 2.34 |
| 74. Water, yard engines......F | 1,550.26 | 1,506.38 | 43.88 | 2.83 |
| 75. Lubricants, yard engines..F | 850.58 | 831.55 | 43.88 | 2.83 |
| 76. Other supplies, yard engines ...................F | 495.20 | 485.10 | 10.10 | 2.24 |
| 79. Motormen. (None.) | | | | |
| 80. Road enginemen .........D | 77,972.24 | 51,110.98 | 26,861.26 | 34.45 |
| 81. Engine house expense, road engines ...............B | 21,144.60 | 11,661.81 | 9,482.79 | 44.86 |
| 82. Fuel, road engines .......C | 103,804.15 | 82,654.74 | 21,149.41 | 20.38 |
| 83. Water, road engines......B | 8,199.25 | 4,765.63 | 3,433.62 | 41.88 |
| 84. Lubricants, road engines..C | 4,506.75 | 3,290.09 | 1,216.66 | 27.00 |
| 85. Other supplies, road engines .................C | 3,060.61 | 2,653.84 | 406.77 | 13.29 |
| 86. Operating power plants. (None.) | | | | |
| 87. Purchased power. (None.) | | | | |
| 88. Road trainmen .........D | 71,322.92 | 56,366.48 | 14,956.44 | 20.97 |
| 89. Train supplies and expenses ...............B | 20,969.65 | 13,614.41 | 7,355.24 | 35.08 |
| Totals ................. | $346.889.47 | $261,209.17 | $85,680.30 | 24.70 |

### VI. *General Expenses.*

| | Total Expense. | Freight. | Passenger. | Passen- ger Per Cent. |
|---|---|---|---|---|
| 106. Salaries and expenses of general officers ........A | $ 14,178.44 | $ 7,760.28 | $ 6,418.16 | 45.27 |
| 107. Salaries, clerks and attendants ..................A | 21,788.98 | 11,928.63 | 9,860.35 | 45.25 |
| 108. General office supplies and expense ...............A | 4,150.28 | 2,337.27 | 1,813.01 | 43.68 |
| 109. Law expense ...........A | 8,075.22 | 4,442.81 | 3,632.41 | 44.98 |
| 110. Insurance ...............B | 4,703.63 | 4,035.76 | 667.87 | 14.20 |
| 113. Stationery and printing...A | 2,073.74 | 1,154.23 | 919.51 | 44.35 |
| 114. Other expense ..........A | 1,675.03 | 944.82 | 730.21 | 43.60 |
| 115. General administration of joint tracks, yards, and other facilities, Dr. ....D | 477.88 | 303.73 | 174.15 | 36.44 |
| 116. Do. Cr. .............A | 310.44 | | | |
| Totals ................. | $ 56,812.76 | $ 32,597.09 | $24,215.67 | 42.62 |

### VII. *Other Expenses Directly Allocated.*

| | Total Expense. | Freight. | Passenger. | Passen- ger Per Cent. |
|---|---|---|---|---|
| Taxes .................... | $ 51,401.14 | $ 39,294.33 | $ 12,106.81 | 23.55 |
| Hire of equipment, Dr...... | 9,762.11 | 9,762.11 | | |
| Hire of equipment, Cr...... | | | 517.44 | |
| Rentals, St. Louis Union Depot ................... | 5,252.24 | | | |
| Other rentals, St. Louis.... | 9,097.20 | | | |
| Rentals, Illinois ........... | 21,594.27 | | | |
| Total rentals ............. | 35,943.71 | 22,945.38 | 12,998.33 | 36.16 |
| Total expenses ........... | 1,498,038.05 | 1,147,123.30 | 350,914.75 | 23.42 |
| Total revenue ............ | 1,564,833.10 | 1,200,301.70 | 364,531.40 | 23.23 |
| Net revenue for 1909...... | 66,795.05 | 53,178.40 | 13,616.65 | 20.39 |
| Value of road............ | 5,500,000.00 | 4,207,679.65 | 1,292,320.35 | 23.45 |
| Net revenue percentage..... | 1.21% | 1.26% | | 1.05 |

199 F.—39

It appears from the foregoing that the whole earnings of the road for 1909 were only 1.21 per centum upon the fair and conceded valuation. This small return resulted in part from the fact that the road is a comparatively small one, and partly because it meets with sharp competition by stronger lines and a well-developed trolley system. It appears inferentially from the testimony that its freight rates cannot be increased. The only practicable escape open to the road, therefore, is to enlarge its passenger returns by obtaining authority to put in a three-cent fare for state passengers. This is not to help out its loss on freight business, but to earn a fair return on the state passenger traffic. Hence the filing of this petition, and the well-prepared case of the receivers, presenting a strong inference that the line was in 1909 obtaining a very inadequate return upon its passenger business. Much expert testimony was taken to the effect that by applying common railroad bookkeeping the freight business in 1909 paid 1¼ per centum, and the passenger 1 per centum.

The important question before the master, and now before us, is whether the best possible rules for dividing the expense between freight and passenger, and between state and interstate passenger business, have been applied. A more difficult question is rarely presented. For want of a better rule, railway experts have adopted the revenue train mile as a fair (or as the least unfair) basis; that is, as the total passenger miles for a year are to the whole number of train miles (freight, passenger, and mixed, excluding switching, repair, and special trains not bringing in revenue), so is the common passenger expense, which cannot be directly applied (unknown), to the whole common expense (a known quantity). Other bases for the division of common expenses, especially between intrastate and interstate freight and passenger business, are the straight revenue basis (or gross earnings basis), train weights, ton miles, passenger miles, engine miles, etc. To apportion common expenses between intrastate freight and passenger business, on the one hand, and interstate business, on the other, the straight revenue basis is sometimes used for certain expenses, as in the Arkansas Rate Cases (C. C.) 187 Fed. 290, 335, 339, 341. To find the value assignable to the freight and passenger business, respectively, freight gross earnings (state and interstate) are taken to represent the freight value, and passenger gross earnings the passenger value, as in Shepard v. Northern P. R. Co. (C. C.) 184 Fed. 765, 811, 812. But for the apportionment of common expenses between freight business, state and interstate, and passenger business, state and interstate, no rule so satisfactory as the revenue train mile basis has been discovered. This method of division at one time received the approval of the Interstate Commerce Commission, has been used by many railway companies for their own information in advance of any controversy on the subject, was adopted by the Wisconsin Railroad Commission in the Buell Case, 1 Wis. R. R. Com'n Rep. 324, and is approved in several decided

cases, particularly the Minnesota case, 184 Fed. 765, supra. Judge Sanborn's discussion of this basis is on 184 Fed. 813, as the one used by the railway companies and adopted by the master. The revenue train mile basis was also used in the Missouri Rate Cases, St. Louis, etc., Co. v. Hadley (C. C.) 168 Fed. 317, 348, as appears from the language of Judge McPherson on page 348 and by the testimony of Mr. Johnson in this case. He says this basis was applied by the expert state accountants, and approved by the court, as, indeed, appears in the report. Care must be taken, in reading these cited opinions, as well as others, to distinguish between the division of common expenses between freight business (state and interstate) and passenger business, on one hand, and the division of earnings for valuation purposes, or the separation of common expenses between intrastate freight and passenger business, and interstate, on the other. None of the opinions are as clearly or carefully stated as they might have been in these respects, but a careful reading leaves no doubt whatever.

To illustrate the difficulty of treating accounts on bases other than the revenue train mile, take account No. 2, Ballast, the total cost of which for 1909 was $1,860.76. Of this 90 per cent. is supposed to be due to weather and 10 per cent. to wear. The 10 per cent. or $186, may therefore be distributed between freight and passenger on the revenue train mile basis, 45.79 per cent., or $85.16, for passenger, and $100.84, freight. How shall the weather proportion be divided? Weather bears no closer relation to gross earnings, or train weights, than it does to revenue train miles. Any application of a weather expense between passenger and freight is unsatisfactory, and for want of a better plan it is divided on the revenue train mile basis. Ties, bridges, and culverts, grade crossings, and fences, cattle guards, and signs (all under the general head "Maintenance of Way and Structures"), rest substantially on the same ground as ballast, while the others of the 19 primary accounts in this head are naturally divisible on the revenue train mile basis.

Under the second general head, "Maintenance of Equipment," many of the primary accounts are directly allocated. The rest are fairly divisible between freight and passenger business upon the revenue train mile basis.

The third general account, "Traffic Expenses," does not bear as close a relation to the revenue train mile as the equipment group; but the amount of common expense distributed to passenger is relatively small. Most of the items have been directly allocated between freight and passenger.

The other two general accounts, 5 and 6, "Transportation Expenses" and "General Expenses," bear a closer relation to revenue train miles than to any other principle of division. Many of the items in these heads are divided by Mr. Hillman on the revenue basis.

On the whole, therefore, we are satisfied that the master has adopted the best method obtainable, one less unsatisfactory than

any other which can be fairly applied. Whether we follow the great weight of evidence, or the decisions cited, we may feel that justice has been done, and that the master's findings and conclusions should be sustained, except one provision. He recommends that the decree provide that a maximum rate of three cents per mile be made chargeable for state passengers. This would probably be the exercise of the legislative power of making rates, and not a judicial power. See cases cited in Peoria Waterworks Co. v. Peoria Ry. Co. (C. C.) 181 Fed. 990, 1004. In this respect the decree should provide that the District Court may, in exercising its function of managing the road in its possession, institute any rate, not exceeding three cents, as in its judgment may be fair and proper.

A decree should be entered in accordance with this opinion.